Timothy A. Scott (SBN 215074)
E: TScott@McKenzieScott.com
Marcus S. Bourassa (SBN 316125)
E: MBourassa@McKenzieScott.com
**McKENZIE SCOTT, PC**
1350 Columbia Street, Suite 600
San Diego, California 92101
Telephone: (619) 794-0451
Facsimile: (619) 202-7461

*Attorneys for Defendant*
*Carlos Manuel Da Silva Santos*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>vs.<br><br>CARLOS MANUEL DA SILVA SANTOS (1),<br><br>            Defendant. | Case No.: 3:23-cr-02507-RSH<br><br>**DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION**<br><br>Date: July 17, 2025<br>Time: 1:30 p.m.<br>Courtroom: 3B<br><br>Hon. Robert S. Huie |

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S
AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

# TABLE OF CONTENTS

I.     INTRODUCTION ....................................................................................1

II.    THE REQUEST FOR $102 MILLION RESTITUTION JUDGMENT
       IMPERMISSIBLY RELIES ON UNSUPPORTED ASSUMPTIONS. ..........1

   A.    Companies Are Only Victims If They Lost Money as a Direct and
         Proximate Result of the Crime. ................................................................2

   B.    Few of the Victims Listed Received, Let Alone Relied Upon,
         Materially False Statements Affecting the Heart of Their Bargain. ....3

      1.    No Evidence Some Companies Received Any False Statements at All
            Before Placing Collateral..................................................................4

      2.    Few Companies Claim to Have Been Induced to Place Collateral by
            False Statements. ...............................................................................5

      3.    Some False Statements Were Neither Material Nor Did They Go to the
            Heart of the Companies' Bargain. ......................................................6

III.   THE GOVERNMENT'S PURSUIT OF LOSSES BASED UPON ETHOS'S
       COLLAPSE RATHER THAN THE CRIME IS OVERLY BROAD. ...........8

   A.    Mr. Santos Does Not Owe Restitution for "Creat[ing] the
         circumstances" in which "loss occurred."...........................................9

   B.    The Government's Evidence Is Similarly Wanting.............................10

   C.    Even If the Government Had Met Its Burden, Intervening Causes
         Render Losses Too Remote from the Offense Itself.............................12

      1.    Mr. Santos's Arrest, Frozen Accounts, and Litigation Were an
            Intervening Cause of Other Companies' Losses. ...............................13

      2.    Mr. Winston's Fraud Was an Intervening Cause of Loss. ....................13

      3.    At a Minimum the Circumstances Are Too Complex to Award
            Restitution Beyond the Stipulated Companies.....................................14

IV.    FOR MOST COMPANIES LISTED, THERE IS INSUFFICIENT NEXUS

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S
AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

TO THE UNITED STATES TO QUALIFY FOR RESTITUTION.............14

V.    MISCELANEOUS  VICTIM-  AND  EVIDENCE-  SPECIFIC  ISSUES
PRECLUDING RESTITUTION..................................................................20

A.    Attorney Proffers and Self-Serving Hearsay ........................**21**

B.    Leaps  from  the  Absence  of  Evidence  Where  the  Government
Concedes Its Records Are Incomplete.....................................**22**

C.    Likit  Has  Already  Partially  Recovered  and  Additional  Funds  Are
Already Frozen in Litigation Initiated By Likit in Turkey. ................**22**

VI.    OTHER FEES..................................................................................................23

A.    Ferrari's Fees ...........................................................................**24**

B.    ST Property Professional Fees.................................................**24**

C.    Miscellaneous Other Fees to ST Property...............................**24**

D.    Sector Resources' Requests. ...................................................**25**

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S
AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

## I.    INTRODUCTION

Mr. Santos agrees he owes restitution to Sector Resources, Terra Financing, and Delphi Studios as set forth below and in his plea.[1] However, this is not a bankruptcy proceeding. Companies who contend they are owed money may have recourse in civil court. But there are "manifest procedural differences between criminal sentencing and civil tort lawsuits," and "restitution serves purposes that differ from . . . the purposes of tort law." *Paroline v. United States*, 572 U.S. 434, 453 (2014). "The effects of restitution orders, too, can be profound." *Hester v. United States*, 586 U.S. 1104, 1106 (2019) (Gorsuch, J. dissenting from the denial of certiorari).

Ultimately, the Court should order restitution in the amount of $17,304,672.95 for:

- Delphi Studios - $7,300,000.00;
- Terra Financing - $1,625,000.00; and
- Sector Resources - $8,379,672.95.[2]

Beyond those amounts and undisputed victims, the Government's motion and evidence is legally and factually wanting. Further restitution should be denied.

## II.    THE REQUEST FOR $102 MILLION RESTITUTION JUDGMENT IMPERMISSIBLY RELIES ON UNSUPPORTED ASSUMPTIONS.

While conceding more than a third of the putative victims were not fraudulently induced at all into their financing arrangements with Ethos, the Government's motion asserts that *every single company* that can claim a negative

---

[1] Sector Resources' request beyond the plea agreement are also addressed herein.

[2] Notably, the Court need not expend resources analyzing whether the evidence in the record supports restitution for the three victims identified in the restitution agreement to the plea agreement. The MVRA provides that the Court "shall" order restitution, even "to persons other than the victim of the offense" where it is "agreed to by the parties in the plea agreement." 18 U.S.C. § 366A(a)(3).

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

balance sheet vis-à-vis Ethos is entitled to restitution. Not so.

### A. Companies Are Only Victims If They Lost Money as a Direct and Proximate Result of the Crime.

The "direct relation between the harm and the punishment" is what gives restitution "precise deterrent effect." *Kelly v. Robinson*, 479 U.S. 36, 49, n10 (1986). But granting restitution beyond the precise crime itself untethers its punitive purpose from the crime. It is also impermissible under 18 U.S.C. section 366A (the Mandatory Victim Restitution Act, MVRA).

Under the MVRA, the Court can order the defendant "make restitution to the victim of the offense." 18 U.S.C.A. § 3663A(a)(1). A "victim" is a person who is both "directly and proximately harmed as a result of the commission of an offense." 18 U.S.C. § 3663A(a)(2).

> Every event has many causes . . . and only some of them are proximate, . . . So to say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result. The idea of proximate cause, as distinct from actual cause or cause in fact, defies easy summary. . . . Proximate cause is often explicated in terms of foreseeability or the scope of the risk created by the predicate conduct. . . . A requirement of proximate cause thus serves, inter alia, to preclude liability in situations where the causal link between conduct and result is so attenuated that the consequence is more aptly described as mere fortuity.

*Paroline v. United States*, 572 U.S. 434, 444–45 (2014).

"[T]he government must show not only that a particular loss would not have occurred but for the conduct underlying the offense of conviction, but also that the causal nexus between the conduct and the loss is not too attenuated (either factually or temporally)." *United States v. Gamma Tech Indus., Inc*., 265 F.3d 917, 928 (9th Cir. 2001) (quoting *United States v. Vaknin*, 112 F.3d 579, 590 (1st Cir.1997)). At a minimum, cause-in-fact requires showing one event "would not have occurred 'but for' the former." *Paroline*, 572 U.S. at 449-450. Critically, although cause-in-fact is a requirement, "proximate cause is more restrictive than a requirement of

factual cause alone." *Id.* at 446.

The Government's brief omits any mention to the requirement of proximate cause and focuses exclusively on whether Mr. Santos's offense caused losses. In any event, the government is wrong on both but-for cause and proximate cause. To evaluate the government's argument, this brief first begins with the crime itself in relation to the putative victims. That assessment reveals that the government's evidence the crime directly impacted the victims for whom it seeks restitution is thin.

## B. Few of the Victims Listed Received, Let Alone Relied Upon, Materially False Statements Affecting the Heart of Their Bargain.

As an initial matter, Mr. Santos charged or convicted here of falsely promising Ethos would perform the deals he signed at the time he signed them. On the contrary, where victims have attempted to frame their otherwise legal contracts with commitments by Ethos as false or fraudulent, the government has disavowed that theory. *Compare e.g.,* Fetz VIS (attorney argument - "This 'Pledge' was a fraud") *with* dkt. 156 at 8 (Fetz, ¶ 25 of the Holerud Declaration, was not among those induced). In fact, the Government's restitution brief concedes that not all of those for whom it requests restitution were fraudulently induced at all. Dkt. 156 at 1 ("*Many* of these 25 borrowers were fraudulently induced . . ."). The Government's brief concedes that 9 of the 25 companies for whom it seeks restitution were *not* fraudulently induced by Mr. Santos or a co-conspirator to enter their finance agreements with Ethos or place collateral.[3] Combined these nine companies' restitution claims are for $24,190,476.27.

_____

[3] At page 8, the United States asserts only that only certain victims were fraudulently induced. Those exclude are Likit Kimya, Fetz, F7 Sports, BRV, Plastic Bank, RA Solar, Coprossel, Coopermil, and ADM.

On July 9, 2025, the United States abruptly, and without accompanying explanation, filed a declaration from the Plastic Bank CEO making a contrary claim. Particularly given the timing, Mr. Santos asks that it be stricken.

-3-

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

However, as set forth below, the Government's already-broad concession should apply to virtually <u>all</u> of the additional 22 victims seeking restitution here – an especially fatal failure since the United States lacks evidence supporting its overarching claim about Ethos's collapse resulted from the crime.

### 1. No Evidence Some Companies Received Any False Statements at All Before Placing Collateral.

Although the government concedes a number of companies did not receive false statements at all, in some instances the evidence of a false statement is unreliable and threadbare.

For example, regarding GAVEA, the evidence of a false statement is apparently a statement Agent Holerud took down after a videoconference with a representative through an interpreter. Exh. 18. That representative purportedly said he "saw a bank statement . . . indicating [Ethos] had a $500 million balance." *Id.* He did not say when. He did not say from whom he got it. He did not say at what bank. He said he received it "via email" and would "look for that," but never produced it to the agents since he was interviewed in December. *Id.* Meanwhile although Agent Holerud has reviewed and obtained voluminous emails, he does not claim to have found it himself either, let alone explain when and from whom the email was sent. A single, self-serving assertion that could be, but has never been, readily verified (if true) cannot suffice as proof of a false statement placing it within the ambit of Mr. Santos's conviction. Absent additional information, the Court is left to assume it was false and came from Mr. Santos or a conspirator – as opposed to, for example, a broker acting independent of Mr. Santos hoping for a commission or simply a misremembered currency.[4]

Similarly, Exsan claims to have received a presentation with a single slide containing vague statements about Ethos's "Global Financing Operations,"[5] but

---

[4] 500 million Turkish Lira is around $12 million.

[5] Although it lists amounts, it does not state if these are amounts lent, deals signed,

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

neither Agent Holerud or Exsan describes when, how, or from whom the presentation was given to Exsan.

Many of the putative false statements occur at unclear times that are never clarified.[6] Of course, where they may have received a false statement *after* placing collateral, the false statement could not have caused them to do so. However, the government evidently did not ask the victims to confirm when they received the statements asserted.

Thus, in relation to several putative victims, there is insufficient evidence of even a false statement that *could* have caused collateral to be placed.

## 2. Few Companies Claim to Have Been Induced to Place Collateral by False Statements.

But even if those companies received false statements a bigger problem looms. The Government offers virtually no evidence whatsoever that companies actually *relied upon*, let alone noticed, statements that later proved false in making their decisions. The absence of evidence on inducement pervades the United States's restitution arguments.

Setting aside the 9 companies whom the United States concedes it cannot prove were fraudulently induced and those 3 whom Mr. Santos concedes should receive restitution, the government only offers evidence that 2 of the remaining 13 companies relied upon false statements: Green Glycols and ST Property.[7] Two

_____

or mere applications seeking financing from Ethos. Exh 17A, Dkt 156-14 at 19. It is, at most, simple puffery Exsan may have never even noticed or considered.

[6] See, e.g., the claims of MGO and TAR Airlines in relation to bank statements as well, in which neither Agent Holerud nor the putative victims describe when they received these documents.

[7] Several companies describe having credited false claims about delays in disbursements. However, those claims to not alter the MVRA analysis, which focuses on what losses would have occurred *but-for* the offense. Such false claims might comprise criminal fraud in the abstract, but companies' funds had already left their accounts by the time any such offense may have been committed. Truthfully

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

more claim through their lawyers to have relied upon false statements.[8] But as the Court previously noted in regard to these very issues, the Government "must prove it with evidence and not simply with a proffer." Tx. May 16, 2025 at 17. Meanwhile, even for those few who claim to have relied, the government did not produce even an email or other internal document confirming these companies' self-serving and conclusory assertions.

Meanwhile, though Mr. Santos describes materiality issues below, the lack of evidence of inducement and reliance is not surprising. Solatio, who received internal financial documents from Ethos via an Ethos employee, *knew* the statements had never been audited by any accounting firm. Exh. 15 (he "recalled having a conversation with [Mr. Santos] about why the document was not audited"). Mr. Santos explained the same to ST Property without being prompted. Exh 7B ("Please remember . . . we don't have obligation of audit accounts," and they are "fully only for internal prupose [sic]"). Several of the government's claims depend upon descriptions of false statements about Mr. Santos's personal wealth having nothing to do with companies' business with Ethos.[9]

With no evidence companies relied upon false statements beyond Green Glycols, the government's restitution presentation false almost completely flat.

### 3. Some False Statements Were Neither Material Nor Did They Go to the Heart of the Companies' Bargain.

"[E]ven if misrepresentations result in money or property changing hands, they still may not necessarily constitute fraud." *United States v. Milheiser*, 98 F.4th 935, 942 (9th Cir. 2024). "[I]f the person was not deceived about something

---

informing them a tranche would not arrive would not have meant they never suffered loss.

[8] TAR Airlines and Exsan de Mexico.

[9] See, e.g. Solatio (Mr. Santos claiming high net worth); CEMAG (same); and MGO (Kastensmith claimed Mr. Santos had high net worth).

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

essential to the bargain itself," then the misrepresentations cannot comprise a criminal scheme to defraud within the meaning of the statute. *Id.* at 943. Thus, salespeople can sometimes *lie* about who they are to induce sales. *Id.* Rather, "[a] misrepresentation will go to the nature of the bargain if it goes to price or quality, or otherwise to essential aspects of the transaction." *United States v. Milheiser*, 98 F.4th 935, 944 (9th Cir. 2024).

Meanwhile, only material statements qualify under the statute. "The 'demanding' materiality requirement substantially narrows the universe of actionable misrepresentations." *Kousisis v. United States*, 145 S. Ct. 1382, 1398 (2025).[10] Materiality is based on an objective, reasonable person standard in the market at issue. *See United States v. Lindsey*, 850 F.3d 1009, 1015-17 (9 Cir. 2017). While expert testimony can be useful to establish industry standards, *id*. at 1016, the government has offered none.

This background is essential to evaluating which companies were victims here because, for example, the government contends there are losses by virtue of claims Mr. Santos or Ethos engaged in puffery about his net worth.[11] In fact, claims about Mr. Santos's own wealth and background are even less material and have less to do with the essence of companies' bargain than at issue in *Milheiser*. At least in *Milheiser* the false claims were about the company with whom victims did business, rather than its CEO. Companies here were not signing deals in which Mr. Santos personally and there is little reason to believe the wealth of the CEO was a material term of the deals among sophisticated companies operating internationally.

Companies claiming they received unaudited financial documents are

---

[10] *See also*, *id.* at 1404-05 (Thomas, J. concurring) ("a demanding approach to materiality is all that prevents an 'extraordinarily expansive view of liability' from rendering the federal wire-fraud statute nearly limitless in scope, . . . lower courts should hold the Government to its word").

[11] *See supra* n. 9 *see also, e.g.* Exsan (presentation about "Financing Operations").

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

similarly situated.[12] Although the wording of some pages varies across those presented, the internal Ethos management statements universally made clear on Page 3 that they were, at most, compilation records about which the statements asserted preparers were "not required to verify the accuracy or completeness" and "did not express an audit opinion or a review conclusion." Exh. 7B, Dkt. 156-4 at 17. The accompanying correspondence similarly disclosed they were "internal" and not audited. *Id.* at 12. It is far from clear that sophisticated international businesses would, let alone did, rely upon such claims.

That the foregoing statements about wealth and past performance and the unaudited finances were not material and did not go to the essence of the bargain vis-à-vis victims seeking restitution is further revealed by the near-absence of claims that companies relied upon these documents in deciding to do business with Ethos. Not one of the 302s submitted by Agent Holerud includes a claim that any victim relied upon these statements in deciding to transact business. Instead they describe the principal terms of the deals: interest rates, costs, a grace period, and the tranches of financing. If they went to the heart of companies' bargain with Ethos and were material, one would expect these companies to have said so – but they did not and, for the most part, have not even as these restitution proceedings have gone forward.

With scarcely any evidence the false statements were material and went to the essence of the bargain, let alone caused inducement, the government can hardly frame the collateral placed as a result of transactions signed by sophisticated businesses as loss resulting from the offense.

## III.    THE GOVERNMENT'S PURSUIT OF LOSSES BASED UPON

---

[12] The Plea Agreement acknowledged distributing financial statements to other victims was relevant conduct and that they were overt acts, but that does not concede that companies relied upon those statements, they were material, or that they went to the heart of the bargain the way fake bank statements might.

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S
AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

# ETHOS'S COLLAPSE RATHER THAN THE CRIME IS OVERLY BROAD.

Having conceded that many companies for which it seeks restitution were not victims in the ordinary sense, the government seeks to bootstrap its claim to restitution on behalf of companies who were not subject to fraudulent inducement by claiming "the Ninth Circuit has crafted the sensible restitution rule that '[a] restitution order is authorized if the defendant created the circumstances under which the harm or loss occurred.'" Dkt. 156 at 9. In light of the far greater failings of its evidence in relation to inducement, materiality, false statements, and the like, the government's broader "circumstances" argument reveals itself as the central premise of virtually all restitution sought beyond the three to whom Mr. Santos has already agreed. But, concerning its "created the circumstances" argument, the Government is legally wrong and its evidence is wanting.

## A. Mr. Santos Does Not Owe Restitution for "Creat[ing] the circumstances" in which "loss occurred."

Starting from the government's legal premise, the United States is mistaken. *Spinney* and *Keith*, the cases upon which the Government relies for claiming restitution to companies who were *not* induced into losses by the crime itself, are wholly inapplicable. However "sensible" the rule sought here may have been when and where it applied, it does not apply here and was expressly overturned by Congress.

In *Spinney* and *Keith*, the Ninth Circuit analyzed restitution for damages that resulted from physical assaults under specific sub-sections of a predecessor statute which have no bearing here, both because they do not apply and because no victim suffered bodily injury. *United States v. Spinney*, 795 F.2d 1410, 1416 (9th Cir. 1986); *United States v. Keith*, 754 F.2d 1388, 1393 (9th Cir. 1985). For the overbroad language upon which the Government relies, both cases cited *United States v Richards*, 738 F.2d 1120 (10th Cir. 1984), for its analysis of the Victim

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

1  Witness Protection Act (VWPA) in the 1980's. *Spinney*, 795 F.2d at 1417; *Keith*,
2  754 F.2d at 1393. As *Richards* had observed, the VWPA permitted restitution "in
3  the case of an offense *resulting in*" loss. *Id.* at 1123 (emphasis original). The Tenth
4  Circuit concluded, and the Ninth Circuit later agreed in *Spinney* and *Keith*, that the
5  VWPA at the time did not require the government "prove that the defendant was
6  *directly* responsible for the loss." *Spinney*, 795 F.2d at 1417 (emphasis original,
7  quoting *Richards*). Thus, under the former VWPA, intervening causes of a victim's
8  loss (including even another person's crime) were irrelevant to the analysis. *Spinney*,
9  795 F.2d at 1417; *Keith*, 754 F.2d at 1393; *Richards*, 738 F.2d at 1123. That is NOT
10 the case today.

11      The statute analyzed by these cases both does not apply and has since been
12 profoundly amended. Both the  modern VWRA and the MVRA now *expressly*
13 *require* the government to prove a victim was "<u>directly and proximately harmed</u>"
14 by the defendant's crime before restitution can be awarded for resulting losses. 18
15 U.S.C. §§ 3663(a)(2); 3663A(a)(2) (emphasis added). Thus, Congress has overruled
16 *Spinney*, *Keith*, and *Richards* insofar as they said otherwise. [13] Thus, the
17 government's attempt to convert the restitution analysis into the equivalent of a
18 bankruptcy proceeding is unavailing. Moreover, intervening causes *are* relevant to
19 restitution. *United States v. Meksian*, 170 F.3d 1260, 1263 (9th Cir. 1999).

20      **B. The Government's Evidence Is Similarly Wanting**

21      Here, the government's presentation concededly depends upon its claim
22 Ethos collapsed because of the crime. As set forth above, that logical reality
23 underlying the government's argument applies much more broadly than the
24 government concedes. But how does the government prove the reason for Ethos's

---

26 [13] Another passage of *Spinney* analyzing fines is now more applicable as it discusses
27 *proximate causation* in criminal cases – a concept Congress imported to the
   MVRA's now-in-effect causal requirements. Specifically, proximate causation is
28 narrower in criminal matters than tort. *Spinney*, 795 F.2d at 1415-16 & n2.

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S
AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

putative collapse despite many concededly legitimate deals? The prosecuting attorney's *ipse dixit*. Dkt. 156 at 10 ("Ethos was bound to crumble and fail under its own weight because Carlos Santos lacked the resources to follow through on his financing promises.") That attorney argument is not evidence.[14]

Although a sentencing hearing need not transform into a "second trial," there must remain "concern for the probable accuracy of the informational inputs in the sentencing process." *United States v. Weston*, 448 F.2d 626, 634 (9th Cir. 1971). A sentencing court violates a defendant's Due Process right when it "consider[s] improper, inaccurate, or mistaken information, [or] . . . make[s] unfounded assumptions or groundless inferences in imposing sentence." *United States v. Borrero-Isaza*, 887 F.2d 1349, 1352 (9th Cir. 1989).

The government's leap from Mr. Santos sent false statements to asserting the crime meant Ethos was "bound to crumble" is exactly the type of speculation the Due Process clause prohibits and which must be supported by evidence.[15] However, the government would concede that it has never obtained Ethos banking records from Brazil, where the largest number of companies here are based.[16] The

---

[14] It is also a remarkable turn given the United States has consistently argued Mr. Santos's access to capital made him a flight risk.

[15] Even the viability of Ethos's overall business model is contested. *See* dkt. 76-1 (expert in investment banking, project financing, international business, and private credit opining that the Ethos business model "is broadly consistent with practices and norms in international finance," "Ethos fills a market niche," and "Ethos's Model Would Have Been Attractive to Some Borrowers.").

In fact, at least one company who did business with Ethos and seeks restitution here contends that, "but for Santos' criminal acts, Ferrari *would have received the full disbursement*." Ferrari Victim Impact Statement (emphasis added). In other words, Mr. Santos's crime held Ethos back, preventing it from performing where it otherwise might have.

[16] Remarkably, the United States opposed defense efforts to obtain these itself. Dkt. 86.

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

government has never obtained Ethos banking records from Turkey, where the government knows Ethos operated and wired funds from the United States. The government has repeatedly acknowledged that it does not know what accounts exist outside the United States. While conceding it cannot prove what capital resides abroad and conceding there were legitimate deals (and attendant accounts receivable), the government does not claim to have examined or investigated Ethos's available lines of credit or borrowing capacity in the United States, let alone abroad. The government presents no forensic accounting, no expert testimony, and no insider testimony about the state of Ethos's financing. How do we know Ethos's collapse resulted from the false statements Mr. Santos made in service of his crime? The government looked at a subset of bank records and simply thinks so.

But it is especially hard to credit the government's collapse-caused-by-crime theory considering the frailty of the government's evidence that more than even a handful of companies were induced as a result of Mr. Santos's false statements discussed above. Even if Ethos was doomed to collapse, it may well have done so in the absence of Mr. Santos's offense and, as sometimes happens in trading and business, it simply did not produce the capital anticipated.

What would have occurred in the absence of Mr. Santos's offense. The government simply assumes either that these companies would not have invested at all or, having invested, would have gotten their collateral returned. But businesses invest, borrow, do not to meet their contract obligations, and sometimes fail for a variety of reasons – the government's ipse dixit that Ethos failed because of the crime here cannot convert this restitution sentence into a bankruptcy proceeding for Ethos or Mr. Santos.

### C. Even If the Government Had Met Its Burden, Intervening Causes Render Losses Too Remote from the Offense Itself.

Even if the Government had met its burden of proving the crime was a but-for cause of the victims losses, it has not proven that intervening causes bore no

role. Restitution is only appropriate where "any subsequent action that contributes to the loss, such as an intervening cause" is "directly related to the defendant's conduct." *United States v. Gamma Tech Indus., Inc.*, 265 F.3d 917, 928 (9th Cir. 2001). However, the government's theory is "too attenuated" to impose liability for every company's loss because of intervening causes. *United States v. Swor*, 728 F.3d 971, 974 (9th Cir. 2013).

### 1. Mr. Santos's Arrest, Frozen Accounts, and Litigation Were an Intervening Cause of Other Companies' Losses.

As an initial matter, Mr. Santos's arrest carried profound effects for Ethos. Its accounts in the United States were frozen. He lost access and the ability to manage the business by virtue of his detention. And most importantly, the company suffered a near-total reputational collapse after its CEO was indicted.

Although these consequences flow from the crime, courts do not award restitution stemming therefrom.[17]

### 2. Mr. Winston's Fraud Was an Intervening Cause of Loss.

Meanwhile, contemporaneous to (and in many cases *before)* Mr. Santos signed the deals for which the government seeks restitution here, it was aware that its cooperating witness, Sean Winston, was lying to Mr. Santos about the availability of more than $20 million in capital. For deals signed later in time, Mr. Winston's own fraud and continuing deceit under the government's supervision were an intervening cause of Mr. Santos's belief he *could* perform the deals or, at least, make business partners whole if Ethos did not perform. The effect of Mr. Winston's independent scheme to deceive Mr. Santos and Ethos was that he, with government approval, encouraged Ethos to sign new deals.

Thus Mr. Winston's independent crime against Ethos was an intervening

---

[17] By analogue, the Court would doubtless reject a claim of restitution where an arrestee failed to pay their rent on time – notwithstanding the fact his crime was a but-for cause of the landlord's loss.

-13-

cause of Ethos's business partners' losses.[18]

### 3. At a Minimum the Circumstances Are Too Complex to Award Restitution Beyond the Stipulated Companies.

In light of the government's thin evidentiary showing, the Court might similarly conclude that untangling causation and the effects of the ill-defined offense is too difficult. Under those circumstances, the MVRA provides an outlet. It states:

> This section shall not apply . . . if the court finds, from facts on the record, that . . . determining complex issues of fact related to the cause or amount of the victim's losses would complicate or prolong the sentencing process to a degree that the need to provide restitution to any victim is outweighed by the burden on the sentencing process.

18 U.S.C. § 3663A(c)(3). Mr. Santos concedes that Ethos has debts and that, for the most part, the companies listed here have balance sheets vis-à-vis Ethos that are negative. Still, invoking sub-section (c)(3) makes particular sense here because the issues are extremely complex; the evidence scattered around the world; the sophisticated companies for whom the government seeks restitution may have other recourse via civil action, bankruptcy, receivership, or other provisions of law in their respective countries; and the restitution punishment to be imposed on Mr. Santos (more than $17 million in restitution, concededly) is already profound.

## IV.  FOR MOST COMPANIES LISTED, THERE IS INSUFFICIENT NEXUS TO THE UNITED STATES TO QUALIFY FOR RESTITUTION.

Even if the government had met its burden of demonstrating the companies' losses were sufficiently the result of the crime, its presentation suffers another major

---

[18] Even if Mr. Winston's conduct were not strictly an intervening cause that can be tethered easily to particular companies' losses, he plainly contributed to the victims' losses. The MVRA provides that, under these circumstances, the court "may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant." 18 U.S.C. § 3664(h).

1  failing. "It is a basic premise of our legal system that, in general, 'United States law
2  governs domestically but does not rule the world.'" *RJR Nabisco v. Eur. Cmty.*, 579
3  U.S. 325, 335 (2016) (quoting *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437, 454
4  (2007)). Here, since the Mandatory Victim Restitution Act contains no clear
5  expression that it is intended to apply to foreign victims who suffered losses abroad
6  as a result of conduct Mr. Santos undertook abroad, the court should deny restitution
7  to each company here that is neither a U.S. company nor basing its claim upon
8  conduct Mr. Santos undertook within the United States.

9       Anticipating Mr. Santos's argument, presumably from previous filings and
10 discussions, the United States asserts that each victim's "Injury Has A Nexus to the
11 United States," and points out the there were domestic wires in connection with
12 each transaction complained. Dkt. 156 at 10.[19] That may be so, but that alone does
13 not place foreign victims within the ambit of the MVRA under the circumstances
14 of this case.

15      First, although the MVRA defines the term victim and "does not [expressly]
16 exclude non-domestic persons," *id.* at 11, the government's statutory analysis is
17 starting from the wrong presumption. Federal courts interpreting a statute must
18 presume domestic-only application, "Absent clearly expressed congressional intent
19 to the contrary." *RJR Nabisco v. Eur. Cmty.*, 579 U.S. at 335. That presumption
20 applies "across the board" to the United States Code. *Id.* Thus, the appropriate
21 question is not whether it expressly excludes foreign victims, but whether it
22 expressly *includes them*. Since there is no language of the MVRA expressly
23 entitling foreign companies to restitution, let alone for their detrimental reliance
24 upon statements made by someone abroad to someone abroad, they are excluded

25

26

27  ─────────────────

    [19] The United States also references Mr. Santos' use of email, but offers no evidence
28 those emails ever derived or passed through the United States in any literal, let alone
    legally impactful sense.

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S
AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

1  from the statute.

2      The cases the Government cites to the contrary. In *Pasquantino*, the

3  defendants were convicted of the substantive offense of wire fraud (rather than an

4  inchoate offense, as here). *Pasquantino v. United States*, 544 U.S. 349, 353 (2005).

5  Specifically, while on U.S. soil they purchased goods from a U.S. seller, concealed

6  those goods in vehicles before approaching the Canadian border, and sought to

7  avoid Canadian taxes on their purchases on the imports from the United States. *Id.*

8  In other words, virtually all of the conduct was domestic. *Id.* at 354. Meanwhile,

9  insofar as restitution was fleetingly concerned, the defendants themselves asserted

10 that the MVRA called for restitution to Canada as a means of arguing that the object

11 of the prosecution was to recover taxes and fit the restitution scheme into their

12 strained effort to dismiss the case altogether. *Id.* at 365. The Supreme Court's

13 response only *supports* Mr. Santos's argument here:

14     If awarding restitution to foreign sovereigns were contrary to the
15     revenue rule, the proper resolution would be to construe the Mandatory
       Victims Restitution Act not to allow such awards, rather than to assume
16     that the later enacted restitution statute impliedly repealed § 1343 as
       applied to frauds against foreign sovereigns.
17

18 *Id.* The *Pasquantino* petitioners lost because there was no common-law revenue

19 rule as of the adoption of the wire fraud statute holding, let alone implying, that a

20 prosecution for wire fraud was totally barred when its object was to evade foreign

21 taxes. *Id.* at 360. Notably, however, the government had conceded in the trial court

22 that restitution to government of Canada would be inappropriate notwithstanding

23 the text of the MVRA. *Id.* at 382 (Ginsburg, J. dissenting).

24     In contrast to the *Pasquantino* defendants, Mr. Santos does not challenge his

25 conviction or the theory of prosecution. Mr. Santos directed his actions at U.S.

26 victims whom he concedes are entitled to restitution. But, Mr. Santos

27 simultaneously seeks to enforce the presumption against application of restitution

28 to foreign entities based upon foreign conduct – a course implicitly endorsed by the

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S
AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

*Pasquantino* Court. Unlike the *Pasquantino* defendants an overwhelming majority of the actions for which the government seeks restitution here occurred abroad. Other than wires to or from U.S. banks, the United States offers *zero* evidence of activity by Mr. Santos in the U.S. in relation to the 21 foreign, corporate clients seeking restitution.[20]

The proper interpretation of the MVRA as applying strictly to companies who suffer losses by virtue of domestic conduct is reinforced by the text of the MVRA itself. For example, among its procedural requirements, the MVRA requires that restitution be reduced by "any amount later recovered as compensatory damages for the same loss . . . in (A) any Federal civil proceeding; and (B) any State civil proceeding," 18 U.S.C. § 3664(j)(2), but contains no similar provision describing how recovery abroad ought be treated vis-à-vis this court's restitution orders. A natural reading of that language is that Congress contemplated that only domestic conduct that might otherwise give rise to liability in the domestic court system would be covered, but not conduct that would more naturally be the subject of foreign litigation over liability – which Congress chose to wholly omit from the ambit of the statute by not expressly stating that it was included.[21]

Nor is there anything unusual or amiss about declining to consider low to foreign companies who negotiated deals abroad with a foreign defendant merely because U.S. wires were tangentially involved. The Ninth Circuit has applied the

---

[20] *United States v. Bengis*, 631 F.3d 33, 40 (2d Cir. 2011), is further afield. There, the Second Circuit analyzed whether the South African government suffered a loss at all from the defendants smuggling of lobster into the United States in violation of the Lacey Act and the defendants evidently did not raise any issue with the extraterritorial application of the MVRA. *Id.*

[21] In this case, this omission is not a bizarre hypothetical. At least two of the foreign companies for whom the government advocates restitution have initiated litigation to recover from Ethos entities domiciled in their own countries, CEMAG in Brazil and Likit in Turkey, where they actually communicated with Mr. Santos as well.

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

presumption the law applies only to domestic effects in the analogous context of relevant conduct for fraud and money laundering under the sentencing guidelines and held that "applying the relevant conduct analysis to Defendants' foreign conduct is not permissible." *United States v. Chao Fan Xu*, 706 F.3d 965, 992 (9th Cir. 2013), *as amended on denial of reh'g* (Mar. 14, 2013), *and abrogated on other grounds by RJR Nabisco v. Eur. Cmty.*, 579 U.S. 325 (2016). In *Chao Fan Xu,* the defendants engaged in a RICO Conspiracy:

> scheme, wherein the Defendants: stole as much money as possible from the Bank of China; transferred the stolen funds out of China; escaped, through immigration fraud, to a safe harbor in the United States; and then spent the funds in, among other places, Las Vegas casinos. Defendants were thus engaged in an international enterprise, using many of the tools of the global economy.

*Id.* at 974. They were also convicted of a conspiracy to launder the proceeds of their international fraud into the United States, including by wiring funds to U.S. institutions and drawing on credit lines backed by proceeds at Las Vegas casinos. *Id.* at 973. In other words, as in this case, there were domestic wires involving U.S. banks – in fact, the defendants fled to the U.S. with their proceeds and committed immigration fraud to do so. *Id.* at 972-73. Also, as in this case, the defendants were foreign nationals who committed fraud against a foreign entity while on foreign soil. *Id.* at 992. Jurisdictional requirements for a money laundering conspiracy were met because "the transactions took place in the United States." *Id.* at 982. Although there were domestic wires, and domestic jurisdiction, and domestic offenses within and against the United States, the Ninth Circuit observed that "the United States was only indirectly affected by Defendants' bank fraud." *Id.* It would not have been complex to consider the losses caused by foreign conduct – defendants acts "would have been a crime" under either nation's laws. *Id.* Still, the Ninth Circuit observed that the statutes in issue did not specifically cover extraterritorial conduct, and embraced the Second Circuit's reasoning in *United States v. Azeem*, 946 F.2d 13

-18-

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

(2d Cir.1991) – since there is no express instruction from Congress that the guidelines consider foreign conduct, court ought not. *Id.* at 992. The "connection between" defendants' criminal activity abroad "and the United States is too attenuated to be considered." *Id.*

*Azeem* is even more persuasive here. There, the defendant was convicted of a conspiracy to import heroin into the United States. As part of that conspiracy, the defendant imported heroin to New York and to Cairo. *United States v. Azeem*, 946 F.2d 13 (2d Cir.1991). The Second Circuit rejected his argument that the Cairo heroin should not have been included because it was the subject of a different conspiracy because the transactions were part of the same course of conduct. *Id.* at 16. Like the MVRA, the text of the Guidelines for Azeem's sentencing was broad, covering "all such acts and omissions that were part of the same course of conduct." *Id.* (quoting U.S.S.G. § 1B1.3(a)(2)). But, the Second Circuit concluded the heroin in Cairo could not be considered because Congress had not clearly expressed an intent that foreign conduct be considered. *Id.* "Congress has already shown that where it intends to include foreign crimes in sentencing, it will do so." *Id.*

As in *Azeem* and *Chao Fan Xu*, this case involves a conspiracy that violated U.S. law, involved domestic activity satisfying jurisdictional requirements, but also encompassed conduct abroad. But mere domestic wires are "too attenuated" a nexus upon which to convert sentencing here in the United States into a money judgment in favor of nearly two dozen foreign companies who claim losses as a result of conduct abroad in deals struck abroad. In contrast to *Azeem* and *Chao Fan Xu*, the government seeks to penalize Mr. Santos for activities abroad which it concedes were not even criminal under U.S. law – those many international companies whom it concedes were not even fraudulently induced but who nonetheless have negative balance sheets vis-à-vis Ethos.

The government has known of the defense position on these issues since the plea in this case was struck. The government has similarly known the defense would

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

rely on *Chao Fan Xu* and *Azeem* and the presumption against extraterritorial application to challenge application to foreign entities. *See, e.g.,* Dkt. 135 at 2 (PSR Objections); dkt. 127 at 9-10 (Mot. re: Breach). Yet the government's motion does not expend a word on them in its motion. The silence is deafening.

Indeed, the government's reliance on a *United States v. Elbaz*, 52 F.4th 593 (4th Cir. 2022), only reveals the weakness of its argument. There, the defendant engaged in a conspiracy from abroad to commit wire fraud, and substantive wire fraud, the object of which was to defraud companies – both domestic and international. *Id.* at 605. There, in contrast to the relevant conduct considerations at issue in *Azeem* and *Chao Fan Xu*, the court observed that an assessment of who qualifies as a victim of the offense under the MVRA is even narrower. *Id.* at 610. Even where a conspiracy has a domestic object such that there is U.S. jurisdiction, the court cannot award foreign victims restitution based upon criminal activity abroad. *Id.* The "the presumption against extraterritorial application applies to provisions, like the [MVRA]." *Id.* The existence of domestic wires is too "attenuated," to make a difference. *Chao Fan Xu*, 706 F.3d at 982.

Absent an express statement from Congress that criminal restitution was intended to serve these purposes under the MVRA based solely on the attenuated nexus of a wire touching a U.S. bank account, the Court should decline to award restitution to 21 of the 25 companies listed by the Government.[22]

## V.    MISCELANEOUS VICTIM- AND EVIDENCE- SPECIFIC

---

[22] The three victims against whom Mr. Santos concedes he owes restitution (Sector Resources, Terra Financing, and Delphi Studios) are all domestic concerns and/or involved domestic acts by Mr. Santos, such as his declaration submitted in the Sector Resources litigation. The only additional company the United States has identified as domestic and to whom Mr. Santos concedes this argument does not apply is Gold Crew Financial. Holerud Decl. ¶ 10 ("principal place of business in Kansas City, Kansas").

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

## ISSUES PRECLUDING RESTITUTION.

### A. Attorney Proffers and Self-Serving Hearsay

The government's presentation frequently turns upon mere proffer by a company's attorney or self-serving hearsay that Mr. Santos cannot meaningfully challenge or confront without cross examination.

For example, the government's presentation for Ferrari and TAR Airlines each rely upon attorney proffers. Holerud Decl. ¶¶ 11(d) & (f); 12(b), (d)-(e). Even if "victim affidavits will generally provide sufficient, reliable evidence to support a restitution order," these are not affidavits. *United States v. Waknine*, 543 F.3d 546, 557 (9th Cir. 2008). They are similarly conclusory and self-serving.

Agent Holerud's reports of hearsay, the distillation of his summary notes from translated videoconferences[23] are similarly neither complete, nor sworn, nor even reasonably subject to cross-examination by Mr. Santos. These issues are particularly acute in relation to the many international (predominantly Brazilian) companies for which neither the United States nor Mr. Santos has been able to obtain banking records for either Ethos or the putative victims. *See* dkt. 79 (explaining that Ethos Brazil was a separately administered corporation that holds its financial and business records). Nor are many of these witnesses even subject to the Court's subpoena powers such that Mr. Santos could seek to cross-examine them.[24]

Considering such evidence sufficient to enter a judgment for tens of millions

---

[23] In some instances, even the source or circumstances of the hearsay are unclear. See, e.g., Holerud Decl. ¶ 19f ("Coopermil reports receiving a $2,017,600 disbursement from Ethos, but nothing else"); Exh. 19 (which does not contain such an accounting from the Coopermil representative).

[24] These issues only further counsel in favor of construing the MVRA to exclude their extraterritorial losses absent evidence the conduct resulting in their losses occurred in the United States.

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

of dollars against Mr. Santos would violate Due Process.

**B. Leaps from the Absence of Evidence Where the Government Concedes Its Records Are Incomplete.**

Elsewhere the Government repeatedly seeks to prove a negative by having Agent Holerud acknowledge he has not seen evidence demonstrating a fact. *See, e.g.,* Holerud Decl. ¶¶ 25f ("the only disbursement from Ethos to Fetz apparent from the evidence [he collected] in this case"). But Agent Holerud does not claim to have, as relevant to the example, a complete set of Ethos or the victim's bank records.

That Agent Holerud has not seen something is not evidence of its absence.

**C. Likit Has Already Partially Recovered and Additional Funds Are Already Frozen in Litigation Initiated By Likit in Turkey.**

Likit, for whom the United States seeks a restitution judgment of more than $8.5 million, did not submit even a Victim Impact Statement here seeking restitution or indicating whether they have already partially recovered or initiated civil proceedings elsewhere. Nonetheless, the United States has sua sponte taken up its putative cause without a request from Likit, which it has similarly done for other companies in this matter who submitted no impact statement. However, the undersigned is informed by Ethos' counsel in Turkey that Likit *has* initiated an action in the Turkish legal system, has already partially recovered its losses, and has tied up still more capital derived from Ethos accounts in Turkey in litigation wherein Likit is currently appealing an adverse ruling.[25]

---

[25] The undersigned is unfamiliar with Turkish law and does not intend to waive privilege in any respect by relaying summary hearsay from Ethos's counsel in Turkey here. However, owing to the legal obstacles to obtaining evidence from Turkey, let alone translating and interpreting court documents, the undersigned could not reasonably obtain evidence to present here on the subject of that litigation in the time permitted.

Undersigned counsel, unfamiliar with the precise claims or basis under Turkish law, understands from speaking with Ethos counsel in Turkey that the basis of Likit's lawsuit is – in essence – the same business agreement for which restitution is sought here. Counsel is further informed, though subject to fluctuations in the

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

"The primary and overarching goal of the MVRA is to make victims of crime whole," *United States v. Kovall*, 857 F.3d 1060, 1067 (9th Cir. 2017), not to afford them a windfall. Likit has already partially recovered. Furthermore, it stands to recover still more. If it ultimately obtains a judgment in both Turkey and the United States, it may be able to separately enforce them and reap a windfall.

As set forth above, this is one reason counseling in favor of a narrow construction of the MVRA to focus on domestic victims, or at least those who were the victims of domestic conduct. Failing that, the Court should hold any restitution award to Likit in abeyance pending resolution of its suit in Turkey.

## VI.    OTHER FEES.

Although the MVRA permits restitution for "expenses incurred during participation in the investigation or prosecution of the offense," 18 U.S.C.A. § 3663A(b)(4), this provision receives a "narrow[] construction." *Lagos v. United States*, 584 U.S. 577, 582 (2018). It is doubtful Congress intended the court "resolve . . . potentially time-consuming controversies" over the necessity of an expense. *Id.* at 583. Thus the statute covers only "necessary . . . other expenses" are only those that were necessary to the government investigation and criminal proceedings. *Id.* The MVRA *does not* entitle victims to recover all "losses suffered . . . as a proximate result of the offense. *Id.* at 584.

The Government (and Sector Resources on its own behalf) contend that any restitution order should include reimbursement for certain fees, including:

- $98,208.99 in attorneys' fees to Ferrari;
- $46,012.77 in "fees from a third-party document production vendor" to Ferrari;
- $424,084 in professional fees to ST Property;
- $734,768 in bank fees, interest, and currency exchange losses to ST Property;

---

conversion rate between Lira and the Dollar, that Likit has already received approximately $330,000 from a personal account of Mr. Santos's in Turkey and an Ethos TR account.

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

- $40,470.00 in attorney's fees in connection with this prosecution to Sector Resources;

- $89,202.95 in fees Sector Resources paid its bank to obtain the Standby Letter of Credit in connection with its Ethos agreement; and

- $319,543.73 in interest Sector Resources paid in connection with a loan it took in connection with its cash collateral.

Mr. Santos briefly discusses each in-turn.

### A. Ferrari's Fees

As already discussed above, this request is based exclusively on Ferrari's attorney's proffer. That is not evidence.

Meanwhile, Ferrari makes no showing that its nearly $150,000 in fees (both legal and to a "third-party document production vendor") were "necessary," by describing – for example, the attorney's rates, hours, or the volume of data reviewed and produced to the United States.

### B. ST Property Professional Fees.

Neither the United States nor ST Properties describes the legal basis for awarding ST Properties $424,084 in "legal and other [unidentified] professional fees" incurred in "negotiation, execution, and mediation with Ethos regarding the transaction." Stivala Decl. ¶ 20. Not only is the overarching number apparently an amalgam of different expenses, but there is no evidence ST Property would not have negotiated with Ethos but for the offense conduct.

### C. Miscellaneous Other Fees to ST Property.

Both Mr. Stivala and Agent Holerud say nothing more about the additional $734,768 in fees sought than that they were "bank fees, interest, and currency exchange losses." Without evidence describing when and why ST Property incurred these expenses, it is impossible to discern whether they are properly compensable. Insofar as the Court concludes ST Property is a victim, it was the government's burden to show entitlement to these expenses and they should consequently be

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION

1  denied.

2  **D. Sector Resources' Requests.**

3      Mr. Santos concedes Sector Resources is a victim and does not oppose this

4  request that $40,470.00 in professional fees be added to its restitution award based

5  upon counsel's declaration describing its basis. Nor does Mr. Santos oppose Sector

6  Resources request for $89,202.95 in fees associated with obtaining its Standby

7  Letter of Credit.

8      The request for $319,543.73 in interest it paid JP Morgan is opposed,

9  however. Sector Resources evidently chose to obtain a loan of $2.75 million to use

10  as cash collateral and incurred $319,543.73 as a "pro rata share" of the accrued

11  interest it owes on its nearly $20 million loan balance with JP Morgan. Exh. A-6.

12  The company's banker characterizes this as an "estimate." *Id.* Meanwhile, when it

13  sought Ethos's financing it represented to Ethos that it had "liquid assets available

14  to secure" the necessary guarantee – specifically gold – "valued at USD $8,861,465

15  . . . to be converted to cash." Exhibit 101. But Sector Resources choice not to

16  convert its gold to cash and, instead, to take out a substantial loan (presumably

17  backed by the gold that Sector Resources judged would accrued in value at a higher

18  return than its interest obligations) was not foreseeable to Mr. Santos and is too

19  attenuated from his offense to qualify as an expense subject to restitution.

20

21      Respectfully submitted,

22

23      **McKENZIE SCOTT, PC**

24  Dated: July 11, 2025        By:   */s/Marcus S. Bourassa*
                                         MARCUS S. BOURASSA
25                                       TIMOTHY A. SCOTT
                                         *Attorneys for Defendant*
26                                       *Carlos Manuel Da Silva Santos*

27

28

-25-

DEFENDANT'S CONSOLIDATED RESPONSE IN PARTIAL OPPOSITION TO USA'S
AND SECTOR RESOURCES' MOTIONS FOR RESTITUTION